## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## SOUTHERN DIVISION

**WESTPORT INSURANCE**
**CORPORATION,**

            **Plaintiff,**                                    **Civil Action No.  AW-04-2315**

     **v.**

**DAVID ALBERT,** *et al.,*

            **Defendants.**

_____

### MEMORANDUM OPINION

      In this action, Plaintiff Westport Insurance Corporation ("Westport") seeks a judgment declaring that a probate proceeding and a malpractice action between Bruce Burtoff ("Burtoff") and  Defendants David Albert ("Albert"), Carolyn Quill ("Quill"), and Rubino & McGeehin, Chartered ("R&M") (collectively, "Defendants"), are not subject to coverage under two policies of accountants' professional liability insurance that Westport issued to Defendant R&M.  Currently before the Court are Westport's Motion for Judgment on the Pleadings [14] and Defendants' Motion to Amend Answer and Counterclaim [17].  The Court has reviewed the pleadings and applicable law and has determined that a hearing is unnecessary.  See Local Rule 105(6) (D. Md. 2004).  For the reasons that follow, Defendants' Motion to Amend Answer and Counterclaim is denied, and Westport's Motion for Judgment on the Pleadings, which the Court will treat as a Motion for Summary Judgment, is granted.

### FACTUAL & PROCEDURAL BACKGROUND

      The following facts are taken in the light most favorable to the nonmovant.  Ruth F. Bernstein ("Bernstein"), the aunt of Burtoff, executed a Will on May 23, 1996, and a Codicil to the Will on

December 23, 1996.  In the Codicil, Bernstein declared that Albert would be the Personal Representative of her estate following her death, and, apart from certain charitable bequeaths, directed that the balance of her estate be distributed to Burtoff, Burtoff's then-wife, and a generation-skipping trust ("GST") for Burtoff's children.

On December 16, 1998, Bernstein entered into a Private Annuity Agreement ("PA Agreement") with an entity created by Burtoff named RB Investments, LLC ("RB Investments").  Pursuant to the PA Agreement, Bernstein transferred securities with an approximate value of $2,292,950.00 to RB Investments, and RB Investments was to pay Bernstein the sum of $115,635.00 each calendar quarter for the rest of her life.  The PA Agreement, provided that it satisfied certain criteria, was intended as an estate planning method by which Bernstein could transfer funds to her beneficiaries, including Bertoff, without incurring estate taxes or gift taxes.  Bernstein subsequently died in January 1999.

Following Bernstein's death, Albert and Burtoff engaged in a contentious dispute concerning their respective rights and duties in connection with the Estate.  On November 29, 2001, Burtoff filed a petition in the Superior Court of the District of Columbia, Probate Division, seeking the removal of Albert as the Personal Representative of the Estate.  See Bruce D. Burtoff, M.D. v. David Albert, as personal representative of the Estate of Ruth F. Bernstein, No. 1999-340A (D.C. Super. Court, Probate Division) ("the Probate Action").  On that same day, Burtoff filed a motion seeking to expedite removal of Albert as Personal Representative of the Estate.[1]

---

[1] Defendants' Answer and Counterclaim admits that "by or before January 1, 2002, Albert was aware of a claim by Burtoff as defined in Section I.A. of the 2001 and 2002 policies."  Answer, ¶ ¶ 20 and 28; See also Answer, ¶ 38 ("Defendants further state a claim had been made against Albert prior to January 1, 2002"); Counterclaim, ¶ 16 ("the allegations of Burtoff in the Petition and malpractice

In addition to seeking the removal of Albert as Personal Representative, both the Petition to Remove and the Motion to Expedite aver errors and omissions by Albert in his performance of professional services that allegedly did, or reasonable should have, placed Albert on notice that a claim might be asserted against him. Burtoff's Petition to Remove alleged that Albert created "sketchy and inadequate accounting statements" for the Estate. The Petition to Remove further alleged that Albert "breached his fiduciary duties" and "mismanaged Estate property" by failing to convey Bernstein's home to Burtoff and his wife as required by Bernstein's Will, refusing to fund the generation-skipping trust created by Bernstein, and improperly distributing funds to a residuary legatee. The Petition to Remove concludes that Albert was a "malfeasant" who must be removed as Personal Representative of the Estate due to improper accounting.

In the Motion to Expedite, Burtoff alleges that Albert "breached his fiduciary duty to the Estate and to the Beneficiaries" by, among other things, "refus[ing] to convey" Bernstein's house to the Burtoffs or partially funding the generation-skipping trust, "both of which are required by the Will. The Motion to Expedite further avers that Albert failed, "without reasonable excuse, to perform material duties of his office" by allegedly filing inaccurate accountings of assets and expenses of the Estate "despite repeated requests for a complete, accurate, and detailed accounting."      On January 30, 2002, Burtoff filed a

---

action constitute a claim or claims covered either by the 2001 or the 2002 policy"). Thus, initially, the parties disputed only whether the Petition to Remove is a "claim" as that term is defined in Section I.A. of the 2001 and 2002 Policies. Subsequent to the filing of Westport's Motion for Judgment on the pleadings, Defendants filed a Motion to Amend Answer and Counterclaim seeking to retract the aforementioned admissions. Although the Court denies Defendants' request, for the reasons articulated later in this Opinion, even assuming the Court allowed a retraction of Defendants' admission of an awareness of a "claim," such a retraction would not alter this Court's grant of summary judgment in favor of Westport.

malpractice action ("Malpractice Action") against Albert, Quill, R&M, Jim Farris, and Babirak, Albert, Vangellow & Shaheen, P.C. (The law firm of which Albert is a member).  On August 12, 2002, Burtoff filed an Amended Complaint in the malpractice action against the same defendants.  The Amended Complaint in the malpractice action alleges that Burtoff "asked several times for an estate accounting from Mr. Albert," and that the accounting Albert, Quill, and Farris produced was a "sloppy mess of a work, neither using generally accepted accounting standards or applying anything resembling a reasonableness test."  The Amended Complaint further alleges that Albert created "a sham accounting" because he "so depleted and mismanaged the Estate that he did not have adequate monies to fund the [generation skipping trust]," and "hid legal fees under various rubrics as management accounts, accounting fees, consultant fees, and the like."

     For the calendar years of 2001 and 2002, Westport provided Accountants' Professional Liability Insurance policies for Albert and his firm, R&M. Section I of the 2001 policy provides as follows:

> [Westport] will pay on behalf of the insureds those sums in excess of the deductible which the insureds become legally obligated to pay as "damages" as a result of "claims" first made against the insureds by reason of a negligent act, error or omission in the performance of "professional services," provided "claim" is first made during the "policy period" and written report of the "claim" is received by [Westport] during the policy period or within sixty (60) days thereafter.

See 2001 Policy, Insuring Agreement, Section I.  The 2001 policy defines the term "claim" as "a demand made upon any insureds for 'damages', including, but not limited to, service of suit or institution of arbitration proceedings against any insured."  See 2001 Policy, Definition A.  The 2001 Policy defines the term "damages" to mean, in pertinent part, "monetary compensation for past harms of injuries . . ."  See 2001 Policy, Definition C.  Additionally, the 2001 Policy also specifically  addresses the insureds' duties

for "potential claims":

> If, during the "policy period", any insured first becomes aware of a potential "claim" (i.e., any act, error, or omission which might reasonably give rise to a "claim" against any insured under this policy) and the insured gives immediate written notice of such act, error, or omission to us during the "policy period", any "claims" subsequently made against any insured by reason of that act, error or omission shall be considered to have been made during the "policy period".

See 2001 Policy, Insuring Agreements, Section IV; see also 2001 Policy, Conditions, Section I ("If . . . any insured becomes aware of any potential "claim" in accordance with Insuring Agreement IV, the insured must give prompt written notice to us . . . .").

> Section I of the 2002 Policy provides as follows:

> [Westport] will pay on behalf of any insured all "loss" in excess of the deductible which any insured becomes legally obliged to pay as a result of "claims" first made against any insured during the "policy period" and reported to us in writing, during the "policy period" or within sixty (60) days thereafter, by reason of any "wrongful act" occurring on or after the "retroactive date," if any.

See 2002 Policy, Accountants' Professional Liability Coverage Unit, Section I.A. The 2002 Policy defines "claim", in pertinent part, as "a demand made upon any insured for 'loss' . . . ." See 2002 Policy, General Terms and Conditions, Section IV.A. The 2002 Policy defines "loss" as " 'claims expenses', and monetary compensation for past harms or injuries, provided always that 'loss' shall not include sanctions, fees, fines, or penalties imposed on any insured; or fees or other consideration paid to any insured; or liquidated damages as provided under a contract or statute." See 2002 Policy, Accountants' Professional Liability Coverage Unit, Section V.C. The 2002 Policy expressly provides for certain exclusions from coverage, including, among other things:

> This "policy" shall not apply to any "claim" based upon, arising out of, attributable to, or directly or indirectly resulting from:

B. any act, error, omission, circumstance, or "personal injury" occurring prior to the effective date of this "policy" if any insured at the effective date knew or could have reasonably foreseen that such act, error, omission, circumstance, or "personal injury" might be the basis of a "claim"[.]

See 2002 Policy, General Terms and Conditions, Section III.B.

On July 20, 2004, Westport filed a Complaint against Defendants seeking a judgment declaring that there is no coverage under the Policy for the Malpractice Action. On August 9, 2004, Westport filed an Amended Complaint against Defendants also seeking a judgment declaring that there is no coverage under the Policy for the Malpractice Action. On November 11, 2004, Westport filed a Motion for Judgment on the pleadings. This motion is ripe, and an opinion is now entered.

## STANDARD OF REVIEW

Rule 12(c) provides that "if, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion should be treated as one for summary judgment and disposed of as provided in Rule 56." Fed. R. Civ. P. 12(c); see also Kaiser Aluminum & Chem. Corp. v. Westinghouse Elec. Corp., 981 F.2d 136, 140 (4th Cir. 1992). As the parties have submitted additional materials with their pleadings, the Court will consider Westport's Motion for Judgment on the Pleadings as a Motion for Summary Judgment.

Summary judgment is appropriate only if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 324-25 (1986). Once the moving party discharges its burden by showing there is an absence of evidence to support the nonmoving party's case, Catrett, 477 U.S. at 325, the nonmoving party must come forward with specific facts showing there is a genuine issue for trial. Matsushita Elec.

Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  Summary judgment will be granted unless

a reasonable jury could return a verdict for the nonmoving party on the evidence presented.  See

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

## DISCUSSION

I.      Motion for Summary Judgment

Westport seeks a declaratory judgment declaring that neither the 2001 Policy nor the 2002 Policy

provide coverage for the Probate Action or the Malpractice Action.  In particular, Westport posits that

it has three defenses to coverage under the Policies.  First, neither the 2001 Policy nor the 2002 Policy

provides coverage for the Probate Action because the Probate Action is not a "claim," as that term is

defined by the Policies.  Second, the 2001 Policy does not provide coverage for the Malpractice Action

because it is a claim first made after the expiration of the 2001 Policy.  Third, the 2002 Policy specifically

excludes coverage for the Malpractice Action because, prior to the effective date of the 2002 Policy,

Albert knew or reasonable could have foreseen that the allegations Burtoff made against him in the

Probate Action might be the basis of a claim for damages.  Defendants' opposition does not contest either

of the first two coverage defenses.  As such, the only contested issue here is whether, prior to the effective

date of the 2002 Policy, Albert knew or reasonably could have foreseen that his allegedly wrongful

conduct at issue in the Probate Action might be the basis of a claim.

The Court's analysis begins with the plain language of the policy.  As previously mentioned, the

2002 Policy specifically excludes coverage for claims where the insured had prior knowledge of a

potential claim.  As such, Section III.B. of the 2002 Policy ("the Prior Knowledge Exclusion") provides:

This "policy" shall not apply to any "claim" based upon, arising out of, attributable to, or

7

directly or indirectly resulting from:

> B.   any act, error, omission, circumstance, or "personal injury" occurring prior
> to the effective date of this "policy" if any insured at the effective date
> knew or could have reasonably foreseen that such act, error, omission,
> circumstance, or "personal injury" might be the basis of a "claim"[.]

<u>See</u> 2002 Policy, General Terms and Conditions, Section III.B.

The Prior Knowledge Exclusion essentially consists of two clauses. <u>See</u> <u>Coregis Ins. Co. v.</u> <u>Wheeler</u>, 24 F.Supp.2d 475, 478-80 (E.D. Pa. 1998) (finding that a substantially similar prior knowledge clause consists of two separate parts). First, for the exclusion to apply, the claim at issue must arise out of an "any act, error, omission, circumstance, or 'personal injury' occurring prior to the effective date of this 'policy.'" Here, it is undisputed that the claim Albert is making under the 2002 Policy arises from allegations made by Burtoff against Albert in the Malpractice Action that echo Burtoff's earlier allegations in the Probate action. In the Probate Action, Burtoff sought not only removal of Albert as Personal Representative, but also specifically alleging errors and omissions by Albert in his performance of professional services. Burtoff filed the Probate Action on November 29, 2001. The effective date of the 2002 Policy is January 1, 2002. Thus, the act, error, or omission forming the basis of the alleged legal malpractice took place prior to the inception of the 2002 Policy, thereby satisfying the first condition.

The second clause of the Prior Knowledge Exclusion bars coverage where "any insured at the effective date knew or could have reasonably foreseen that such act, error, omission, circumstance, or 'personal injury' might be the basis of a 'claim.'" Maryland courts have applied an objective standard to prior knowledge exclusions, such as the present, when determining whether an insured had knowledge of a potential claim. <u>See</u> <u>Culver v. Continental Ins. Co.</u>, 1 F.Supp.2d 545, 546 (D. Md. 1998) ("No lawyer

receiving [potential claimant's attorney's] letter . . . could plausibly contend that he did not have a *reasonable basis* to foresee a claim against him on the basis of the contents of that letter.") (emphasis added); <u>Maynard v. Westport Ins. Co.</u>, 208 F.Supp.2d 568, 571 ("Plaintiffs concede that an objectively reasonable attorney would or should have known of the potential malpractice.").

As applied here, a reasonable person who had received the allegations against him, as Albert received in the Probate Action, would have foreseen that those allegations might be the basis of a claim. In the Removal Petition, Burtoff alleged that Albert was "malfeasant"; "breached his fiduciary duties"; "mismanaged Estate property"; "failed to account for the assets of the Estate"; and provided "sketchy summaries" that were "neither accurate nor adequate". Additionally, in the Motion to Expedite Albert's removal, Burtoff alleged that Albert "breached his fiduciary duties to the Estate and to the beneficiaries" by, *inter alia*, "refusing to convey Mrs. Bernstein's house to Dr. and Mrs. Burtoff"; failing "even to partially fund the Generation Skipping Trust"; and "filing materially and intentionally inaccurate accountings of the assets and expenses of the Estate." Indeed, no person who received the allegations set forth in the Removal Petition and the Motion to Expedite, and especially an individual who is both a lawyer and an accountant, could plausibly contend that he did not have a reasonable basis to foresee a claim against him on the basis of the contents of those pleadings.

Defendants attempt to salvage their case by contending that summary judgment would be inappropriate in cases, like this one, where reasonableness is quite often a question of fact. This Court is unpersuaded.

In <u>Culver</u>, the Court expressly stated that "[a]lthough reasonableness is quite often a question of fact, summary judgment may properly be granted where, for example, no reasonable fact finder could come

to a different conclusion than that a certain state of affairs was reasonably foreseeable." Culver, 1 F.Supp.2d at 547.  As previously mentioned, this Court believes that based on the allegations made against him in the Probate Action, Albert certainly had a reasonable basis to foresee that a claim would be made against him.

Additionally, the Court notes that Defendants' reliance on Culver appears odd indeed considering that the Culver Court *granted* summary judgment in favor of the insurer finding that a prior knowledge exclusion barred coverage for a claim brought against the insured attorney by his former client. 1F.Supp.2d at 547.  It appears therefore that Defendants reliance on Culver stems from the Culver Court finding that the insured had received a letter from the former client prior to the issuance of the policy that *expressly* threatened suit against the insured, whereas here Burtoff *never expressly* threatened to file a Malpractice Action before filing it. Despite this factual distinction, the Court is unpersuaded.  The Culver decision never held that a threatened suit was a *requirement* to trigger the prior knowledge exclusion. Quite the contrary, numerous courts have held that the actual threat of a suit is not necessary to establish the insured's prior knowledge of a potential claim.  See e.g. Int'l Surplus Lines Ins. Co. v. Univ. of Wyo. Research Corp., 850 F.Supp. 1509, 1521 (D. Wyo. 1994) (finding that the prior knowledge exclusion "does not require that the person know that a claim has already been threatened, but only whether a claim could reasonably be anticipated in the future — as a matter of probabilities — and in keeping with the facts known to exist at the time"), *aff'd sub nom.* Int'l Surplus Lines Ins. Co. v. Wyo. Coal Refining Sys. Corp., 52 F.3d 901 (10th Cir. 1995); Home v. Indemnity Co. v. Toombs, 910 F.Supp. 1569, 1574 (N.D. Ga. 1995) (rejecting insured's argument — that he lacked knowledge of a potential claim because the subject of a claim had never come up in conversation between the claimant and the insured — as irrelevant.).

Accordingly, this Court finds that Defendants' argument that reasonableness is a question of fact that precludes summary judgment, based on the facts presented in this particular case, lacks merit.

Defendants also argue that because the Probate Action was not itself a claim for damages, it could not have placed Albert on notice that a claim for damages might potentially be made. This Court cannot agree.

The Prior Knowledge Exclusion bars coverage for Burtoff's allegations if, prior to the effective date of the 2002 Policy, Albert "knew or could have reasonably foreseen" that the allegations "might be the basis of a claim." It is undisputed that the Probate Action's Removal Petition sought only to remove Albert as the Personal Representative and did not seek money damages. Indeed, the Removal Petition's failure to alleges damages may not have given Albert knowledge that Burtoff would pursue a malpractice action for damages. Nevertheless, Albert cannot reasonably contend that subsequent to the Removal Petition's aforementioned allegations of errors and omissions on his part, that he did not *reasonably foresee* that a claim for damages might be forthcoming. Therefore, Defendants' argument that Albert lacked notice that a claim for damages might potentially be made lacks merit.

II.    Motion to Amend Defendants' Answer and Counterclaim

Defendants seek leave to amend their Answer to paragraphs 20, 28, and 38 of the Amended Complaint and paragraphs 15, 16, and 17 of their Counterclaim. Defendants allege that they have obtained previously unavailable copies of the 2001 and 2002 policy, and have discovered that, contrary to Westport's representations, significant differences exist in the language of the two Policies.

Under Rule 15(a), leave to amend a pleading "shall be freely given when justice so requires." Fed. R. Civ. P. 15(a). However, leave to amend is inappropriate when based upon considerations of "undue

delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, *futility of amendment*, etc." <u>Foman v. Davis</u>, 371 U.S. 178, 182 (1962) (emphasis added). Here, Defendants' seek to have the following statements retracted: "by or before January 1, 2002, Albert was aware of a claim by Burtoff as defined in Section I.A. of the 2001 and 2002 policies"; "Defendants further state a claim had been made against Albert prior to January 1, 2002," and "the allegations of Burtoff in the Petition and malpractice action constitute a claim or claims covered either by the 2001 or the 2002 policy". Nevertheless, even if the Court allowed Defendants to retract those statements and amend the Answer and Counterclaim, it is still undisputed that, prior to the commencement of the 2002 Policy, Albert was aware of Burtoff's allegations against him. As discussed above, Burtoff's allegations against Albert gave any reasonable person similarly situated reason to foresee that Burtoff might make a claim against him. Because Westport is entitled to judgment as a matter of law, Defendants' proposed amendments to their pleadings cannot change the outcome of this action. Therefore, the Court denies Defendants' motion to amend as futile.

## CONCLUSION

Based on the aforesaid reasons, and the record before this Court, this Court finds that pursuant to

Section III.B. of the Policy, the Policy affords no coverage for the Malpractice Action because it is a claim based upon acts occurring prior to the effective date of the Policy, and a reasonable person could have foreseen that those acts might be the basis of a claim.   Hence, Westport is entitled to summary judgment in its favor against Defendants.   Accordingly, the Court DENIES Defendants' Motion to Amend Answer and Counterclaim, and GRANTS Westport's Motion for Summary Judgment.   An Order consistent with these rulings shall follow.


<u>May 31, 2005</u>                                    _____/s/_____
Date                                                                  Alexander Williams, Jr.
                                                                         United States District Judge